# EXHIBIT A

Wolters Kluwer

**CT Corporation**
**Service of Process Notification**
09/11/2026
CT Log Number 553334865

## Service of Process Transmittal Summary

**TO:** Sarah Diluzio, Corporate Counsel
Dupont Specialty Products Usa, LLC
974 CENTRE RD
WILMINGTON, DE 19805-1269

**RE:** **Process Served in Delaware**

**FOR:** DuPont de Nemours, Inc. (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Jason Jarinko, Tyson Hale vs. DuPont de Nemours, Inc. |
| **CASE #:** | 260803949 |
| **NATURE OF ACTION:** | Environmental Litigation - Personal Injury |
| **PROCESS SERVED ON:** | The Corporation Trust Company, Wilmington, DE |
| **DATE/METHOD OF SERVICE:** | By Process Server on 09/11/2026 at 09:00 |
| **JURISDICTION SERVED:** | Delaware |
| **ACTION ITEMS:** | CT will retain the current log<br>Image SOP<br>Email Notification, Allison Everett allison.l.everett@dupont.com<br>Email Notification, Sarah Diluzio sarah-elizabeth.diluzio@dupont.com<br>Email Notification, Allison Schaper allison.a.schaper@dupont.com |
| **REGISTERED AGENT CONTACT:** | The Corporation Trust Company<br>1209 Orange Street<br>Wilmington, DE 19801<br>8775647529<br>MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

# PROCESS SERVER DELIVERY DETAILS

**Date:** Fri, Sep 11, 2026
**Server Name:** ABC Legal

| | |
|---|---|
| Entity Served | DUPONT DE NEMOURS, INC. |
| Case Number | 260803949 |
| Jurisdiction | DE |

| Inserts | | |
|---|---|---|
| | | |

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)
AUGUST 2026 03949
E-Filing Number: 2608067456

| | |
|---|---|
| PLAINTIFF'S NAME<br>JASON JARINKO | DEFENDANT'S NAME<br>3M COMPANY |
| PLAINTIFF'S ADDRESS<br>393 HIDLAY CHURCH RD.<br>BLOOMSBURG PA 17815 | DEFENDANT'S ADDRESS<br>3M CENTER BLDG., 220-9<br>SAINT PAUL MN 55144 |
| PLAINTIFF'S NAME<br>TYSON HALE | DEFENDANT'S NAME<br>ARCHROMA U.S., INC. |
| PLAINTIFF'S ADDRESS<br>1115 SHORT RD.<br>BLOOMSBURG PA 17815 | DEFENDANT'S ADDRESS<br>5435 77 CENTER DR., #10<br>CHARLOTTE NC 28217 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME<br>ARKEMNA, INC. |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS<br>900 1ST AVE., BLDG. 4<br>KING OF PRUSSIA PA 19406 |

TOTAL NUMBER OF PLAINTIFFS: 2

TOTAL NUMBER OF DEFENDANTS: 12

COMMENCEMENT OF ACTION
- [x] Complaint
- [ ] Writ of Summons
- [ ] Petition Action
- [ ] Transfer From Other Jurisdictions
- [ ] Notice of Appeal

AMOUNT IN CONTROVERSY
- [ ] $50,000.00 or less
- [x] More than $50,000.00

COURT PROGRAMS
- [ ] Arbitration
- [ ] Jury
- [ ] Non-Jury
- [x] Other: CLASS ACTION
- [ ] Mass Tort
- [ ] Savings Action
- [ ] Petition
- [ ] Commerce
- [ ] Minor Court Appeal
- [ ] Statutory Appeals
- [ ] Settlement
- [ ] Minors
- [ ] W/D/Survival

CASE TYPE AND CODE
C1 - CLASS ACTION

STATUTORY BASIS FOR CAUSE OF ACTION

RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)

FILED
PRO PROTHY
AUG 31 2026
S. GILLIAM

IS CASE SUBJECT TO COORDINATION ORDER?
YES NO

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: JASON JARINKO , TYSON HALE

Papers may be served at the address set forth below.

| | |
|---|---|
| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY<br>BENJAMIN P. SHEIN | ADDRESS<br>121 S. BROAD ST., 21ST FLOOR<br>PHILADELPHIA PA 19107 |
| PHONE NUMBER<br>(215)735-6677<br>FAX NUMBER<br>(215)732-3630 | |
| SUPREME COURT IDENTIFICATION NO.<br>42867 | E-MAIL ADDRESS<br>bshein@sheinlaw.com |
| SIGNATURE OF FILING ATTORNEY OR PARTY<br>*BENJAMIN SHEIN* | DATE SUBMITTED<br>Monday, August 31, 2026, 06:20 am |

FINAL COPY (Approved by the Prothonotary Clerk)

**COMPLETE LIST OF DEFENDANTS:**

1. 3M COMPANY
   3M CENTER BLDG., 220-9
   SAINT PAUL MN 55144
2. ARCHROMA U.S., INC.
   5435 77 CENTER DR., #10
   CHARLOTTE NC 28217
3. ARKEMNA, INC.
   900 1ST AVE., BLDG. 4
   KING OF PRUSSIA PA 19406
4. CLARIANT CORP.
   500 E. MOREHEAD ST., STE. 400
   CHARLOTTE NC 28202
5. CORTEVA, INC.
   9330 ZIONSVILLE RD.
   INDIANAPOLIS IN 46268
6. DUPONT DE NEMOURS, INC.
   974 CENTRE RD., BLDG. 730
   WILMINGTON DE 19805
7. E.I. DUPONT DE NEMOURS AND COMPANY
   9330 ZIONSVILLE RD.
   INDIANAPOLIS IN 46268
8. TYCO FIRE PRODUCTS LP
   1400 PENNBROOK PKWY.
   LANSDALE PA 19446
9. AUTONEUM NORTH AMERICA, INC.
   29293 HAGGERTY RD,
   NOVI MI 48377
10. MILCO INDUSTRIES, INC.
    550 E. 5TH ST.
    BLOOMSBURG PA 17815
11. KAWNEER COMPANY, INC.
    201 ISABELLA ST,
    PITTSBURGH PA 15212
12. JOHN DOE DEFENDANTS 1-49
    XXX
    XXX PA XXX

JURY TRIAL DEMANDED

Filed and Attested by the
Office of Judicial Records
31 AUG 2026 06:20 am
S. GILLIAM

**SHEIN LAW CENTER, LTD.**
BY: BENJAMIN P. SHEIN
Attorney Identification No. 42867
121 South Broad Street, 21st floor
Philadelphia, Pennsylvania 19107
(215) 735-6677
bps@sheinlaw.com

**BARON & BUDD, P.C.**
BY: BRETT LAND
TEXAS STATE BAR NO. 24092664
(pending pro hac vice)
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
Telephone: (214) 521-3605
bland@baronbudd.com

**COSSICH, SUMICH, PARSIOLA & TAYLOR, LLC**
BY: ANDREW CVITANOVIC
LOUISIANA STATE BAR NO. 34500
(pending pro hac vice)
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
(504) 394-9000
andrewcvitanovic@cossichlaw.com

*Attorneys for Plaintiff*

**Jason Jarinko**
393 Hidlay Church Road
Bloomsburg, PA 17815

**Tyson Hale**
1115 Short Road
Bloomsburg, PA 17815

Plaintiffs,

v.

**3M COMPANY**
3M Center Bldg 220-9
Saint Paul, MN 55144-1001

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY

AUGUST TERM, 2026

NO.

**COMPLAINT**
**(CLASS ACTION)**

**ARCHROMA U.S., INC.**
5435 77 Center Dr, # 10
Charlotte, NC 28217

**ARKEMA, INC.**
900 1ST Ave Bldg 4
King of Prussia, PA 19406-1308

**CLARIANT CORPORATION**
500 E Morehead St, Ste 400
Charlotte, NC 28202-2744

**CORTEVA, INC.**
9330 Zionsville Rd.
Indianapolis, IN 46268-1053

**DUPONT DE NEMOURS, INC.**
974 Centre Road
Building 730
Wilmington, Delaware 19805

**E.I. DUPONT DE NEMOURS AND COMPANY**
9330 Zionsville Rd.
Indianapolis, In 46268-1053

**TYCO FIRE PRODUCTS LP**
1400 Pennbrook Parkway
Lansdale, PA 19446

**AUTONEUM NORTH AMERICA, INC.**
29293 Haggerty Road
Novi, MI 48377

**MILCO INDUSTRIES, INC.**
550 E 5TH ST
Bloomsburg, PA 17815

**KAWNEER COMPANY, INC.**
201 Isabella Street
Pittsburgh, PA 15212

**JOHN DOE DEFENDANTS 1-49**

Defendants.

# N O T I C E

You have been sued in Court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this Complaint and Notice are served, by entering a written appearance personally or by attorney and filing in writing with the Court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the Court without further notice for any money claimed in the Complaint or for any other claim or relief requested by the Plaintiff(s). You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Philadelphia Bar Association
One Reading Center
1101 Market Street
Philadelphia PA 19107
(215) 238-6300

# AVISO

Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandad expuestas en las paginas siguientes, usted tienne veinte (20) dias, de plazo al partir de la fecha de la demanda y la notificacion. Hace falta asentar una comparencia escrita o en persona o con un abagado y entregar a la corte en forma escrita sus defensas o sus objectiones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificasion. Ademas, la corte puede decidir a favor de demandante y require que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABAGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LAW OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

SERVICIO DE REFERENCIA LEGAL
Uno Reading Center
Filadelfia, Pennsylvania 19107
Telefono: (215) 238-1701

ASSESSMENT OF DAMAGES
HEARING NOT REQUIRED

JURY TRIAL DEMANDED

**SHEIN LAW CENTER, LTD.**
BY: BENJAMIN P. SHEIN, ESQUIRE
Attorney Identification No. 42867
121 South Broad Street, 21st floor
Philadelphia, PA 19107
(215) 735-6677
bps@sheinlaw.com

**BARON & BUDD, P.C.**
BY: BRETT LAND, ESQUIRE
TEXAS STATE BAR NO. 24092664
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219
Telephone: (214) 521-3605
bland@baronbudd.com

**COSSICH, SUMICH, PARSIOLA & TAYLOR, LLC**
BY: ANDREW CVITANOVIC
LOUISIANA STATE BAR NO. 34500
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
(504) 394-9000
andrewcvitanovic@cossichlaw.com

Attorneys for Plaintiffs

---

| | | |
|---|---|---|
| JASON JARINKO | : | COURT OF COMMON PLEAS |
| | : | PHILADELPHIA COUNTY |
| TYSON HALE | : | |
| | : | AUGUST TERM, 2026 |
| Plaintiffs | : | |
| | : | NO. |
| v. | : | |
| | : | |
| 3M COMPANY, et al., | : | |
| | : | |
| Defendants. | : | **COMPLAINT** |
| | : | **(CLASS ACTION)** |

## COMPLAINT - CIVIL ACTION

Plaintiffs, by and through undersigned counsel, file their Complaint against Defendants 3M Company, AGC Chemical Americas, Inc., AGC, Inc., Archroma U.S., Inc., Arkema, Inc., Autoneum North America, Inc., BASF Corporation, Buckeye Fire Equipment Company, Chemdesign Products, Inc., Chemguard, Inc., Chemours Company, Chemours Company FC, LLC, Chemicals Incorporated, Clariant Corporation, Corteva, Inc., Deepwater Chemicals, Inc., DuPont De Nemours, Inc., Dynax Corporation, E.I. DuPont de Nemours and Company, Kawneer Company, Inc., Milco Industries, Inc., Nation Ford Chemical Company, Tyco Fire Products LP, and John Doe Defendants 1-49 (collectively, "Defendants"). Plaintiffs, based on information, belief, and investigation of Counsel, allege as follows:

## I. SUMMARY OF THE CASE

1. Plaintiffs own and/or live or previously owned and/or lived on properties in and around Columbia County, Pennsylvania where the land application of sludge caused the contamination of groundwater with PFAS. Plaintiffs' Properties – including their private water supply wells, in many cases – are now contaminated with per- and polyfluoroalkyl substances ("PFAS").

2. This Complaint refers to each Plaintiff's contaminated real property as "Plaintiff's Property." Collectively, the contaminated properties are referred to as "Plaintiffs' Properties."

3. Testing of private drinking water wells by the Pennsylvania Department of Environmental Protection ("DEP") has shown the presence of PFAS at over 115 properties at levels exceeding the federal MCLs for PFAS.1 According to DEP, "Comparison of well data with soil

1 Pennsylvania Department of Environmental Protection, "Bloomsburg Area/North Centre Township PFAS HSCA Investigation," May 11, 2026, at slide 7, https://files.dep.state.pa.us/RegionalResources/NCRO/NCROPortalFiles/CommunityInformation/North-Centre-Twp-HSCA/N%20Centre%20Hearing%20DEP%20Presentation%205-11-26.pdf (last accessed 8/24/2026).

sampling confirms PFAS impacts are primarily related to land application of municipal sewage sludge as fertilizer."2 The map below indicates the areas of Columbia County where PFAS has been detected in private wells to-date:3




4. The term "PFAS" refers to a number of man-made compounds that are toxic and persistent in the environment, do not biodegrade, move readily through soil and groundwater, and pose a significant risk to human health and safety. Two PFAS compounds are perfluorooctanoic acid

---

2 *Id*. at slide 28.
3 *Id*. at slide 10.

("PFOA") and perfluorooctane sulfonic acid ("PFOS"), which have been discovered on Plaintiffs' Properties.

5. PFOA and PFOS both are known to be toxic, persistent in the environment, not biodegradable, move easily through soil and groundwater, and pose a significant risk to human health and safety. Both are animal carcinogens and likely human carcinogens. Indeed, the United States Environmental Protection Agency ("EPA") has stated that "human epidemiology data report associations between PFOA exposure and high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and cancer (testicular and kidney)" and that "there is suggestive evidence of carcinogenic potential for PFOS."[4]

6. PFAS were used to make consumer and industrial products (collectively, "Fluorosurfactant Products"), including aqueous film-forming form ("AFFF"), a type of fire-fighting foam used at airports, military bases, petroleum refineries, and fire training centers.

7. At various times from the 1960s through today, Manufacturer Defendants (as defined below) designed, manufactured, formulated, marketed, distributed, and/or sold PFAS (including PFOA, PFOS, and the chemical precursors of PFOA and/or PFOS) and/or AFFF.

8. Manufacturer Defendants designed, manufactured, marketed, distributed, and/or sold Fluorosurfactant Products with the knowledge that these toxic compounds would be released into the

[4] *See* U.S. Envtl. Protection Agency ("EPA"), Office of Water Health and Ecological Criteria Division, "Health Effects Support Document for Perfluorooctanoic Acid (PFOA)," EPA Document Number: 822-R-16-003, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_hesd_final-plain.pdf (last accessed 11/22/2022); *see also* EPA, Office of Water Health and Ecological Criteria Division, "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)," EPA Document Number: 822-R-16- 002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed 11/22/2022).

environment during use, handling, storage, and disposal as directed and intended by the Manufacturer Defendants.

9. Upon information and belief, at all relevant times, Manufacturer Defendants' Fluorosurfactant Products have been released, used, stored, handled, and/or disposed of at or near Plaintiffs' Properties or in the watershed upstream of their properties, which allowed PFOS, PFOA, and/or their chemical precursors to enter the environment, and migrate through soil, sediment, groundwater, surface water, and stormwater, thereby contaminating Plaintiffs' Properties.

10. Upon information and belief, PFAS-containing products were used by local industrial users who discharged / disposed of PFAS through its wastewater system to the City of Bloomsburg's municipal wastewater system. Three such industrial users have been named as Defendants here: Autoneum, Milco, and Kawneer (collectively, "Discharger Defendants").

11. Municipal wastewater treatment sludge that contained PFAS, including wastes from the Discharger Defendants, was applied in the vicinity of Plaintiffs' Properties. Over the course of decades, this "land application" of waste containing PFAS allowed contamination of Plaintiffs' and Class Members' Properties.

12. Upon information and belief, use of AFFF in or around Bloomsburg, PA and upstream of Bloomsburg on the Susquehanna River also contributed to the presence of PFAS in the municipal wastewater treatment sludge, which was applied on farmland, leading to the contamination of Plaintiffs' and Class Members' Properties.

13. PFOS, PFOA, and/or their chemical precursors have been detected in the soil, groundwater, surface water, and stormwater of Plaintiffs' and Class Members' Properties at substantial levels.

14. Plaintiffs' and Class Members' Properties have been, and continue to be, contaminated by PFAS from Manufacturer Defendants' Fluorosurfactant Products and PFAS used and/or disposed of by Discharger Defendants.

15. At all relevant times, no Plaintiff or Class Member knew, nor should any Plaintiff or Class Member have known, of the ongoing contamination of their Property through the use, release, storage, and/or disposal of Fluorosurfactant Products as neither the Manufacturer Defendants nor the Discharger Defendants disclosed the toxic nature and harmful effects of these Fluorosurfactant Products or their wastes.

16. At all relevant times, upon information and belief, Discharger Defendants and their predecessors knew or should have known about the inherent risks and dangers involved in directing industrial PFAS wastes to a municipal wastewater system. And at all relevant times, Manufacturer Defendants 3M knew or should have known about the inherent risks and dangers involved in the use of PFAS compounds in products sold to other companies, like Discharger Defendants — including that both PFOA and PFOS are mobile in water, not easily biodegradable, highly persistent in the environment, and present significant and unreasonable risks to both human health and the environment. Nevertheless, Defendants made a conscious choice to manufacture, market, sell, and dispose of PFAS products and waste in a way that caused harm to Plaintiffs.

17. Through this action, each Plaintiff seeks to recover compensatory and/or consequential damages for all past and future costs to investigate, remediate, remove, dispose of, treat, and monitor the PFOS and PFOA contamination of its Property caused by the use, discharge, and disposal of Defendants' Fluorosurfactant Products, as well as any and all other damages recoverable under state and/or applicable federal laws. Each Plaintiff also seeks damages and restitution for the diminution of value of its Property, punitive damages, as well as reasonable attorneys' fees and costs.

## II. PARTIES

### A. PLAINTIFFS

18. Plaintiff Jason Jarinko owns property at 393 Hidlay Church Road, Bloomsburg, PA 17815. A private water well on the property supplies drinking water to the property. PFAS have been detected in the well at Mr. Jarinko's property at levels exceeding the EPA Maximum Contaminant Levels for PFOS and PFOA.

19. Plaintiff Tyson Hale owns property at 1115 Short Road, Bloomsburg, PA 17815. A private water well on the property supplies drinking water to the property. PFAS have been detected in the well at Mr. Hale's property at levels exceeding the EPA Maximum Contaminant Levels for PFOS and PFOA. Land application of PFAS-containing sewage sludge took place at Mr. Hale's property.

20. Each Plaintiff has a property interest in its property, its water well and associated piping, and in the water it appropriates for use.

### B. DEFENDANTS

21. Upon information and belief, the following **Manufacturer Defendants** designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the Fluorosurfactant Products that have contaminated and continue to contaminate Plaintiffs' Properties, causing irreparable harm.

22. **3M:** Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. At all times relevant, upon information and belief, 3M manufactured, marketed, promoted, distributed, and/or sold PFAS including PFOA and/or PFOS to Discharger Defendants for use at their facilities.

23. **ARCHROMA US:** Defendant Archroma U.S., Inc. ("Archroma US") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North

Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorosurfactant Products for use in AFFF.

24. **ARKEMA:** Defendant Arkema, Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema, Inc. is an operating subsidiary of Arkema France, S.A.

25. **BASF:** Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals.

26. **BUCKEYE:** Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. This Defendant manufactured and sold AFFF that contained PFOA.

27. **CHEMGUARD:** Defendant Chemguard, Inc. ("Chemguard") is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. This Defendant manufactured and sold AFFF that contained PFOA.

28. **CHEMOURS:** Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware.

29. Chemours was incorporated as a subsidiary of Old DuPont in February 2014. In 2015, Old DuPont spun off Chemours as a separate corporate entity to hold its "Performance Chemicals" business lines (which included PFAS and numerous products whose manufacture involved the use of PFAS), along with certain of Old DuPont's environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding



Case ID: 260803949

Old DuPont's liability for damages and injuries arising from the manufacture and sale of PFAS and the products that contain PFAS.

30. **CHEMOURS FC:** Defendant The Chemours Company FC, LLC ("Chemours FC") is a Delaware limited liability company with its principal place of business located at 1007 Market Street Wilmington, Delaware. Chemours FC operates as a subsidiary of Chemours. Upon information and belief, Chemours FC is the successor-in-interest to DuPont Chemical Solutions Enterprise.

31. **CLARIANT:** Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205.

32. **CORTEVA:** Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware. Upon information and belief, Corteva is one of the aforementioned spin-off companies from DowDuPont, Inc. and is believed to have contractually assumed certain of Old DuPont's environmental liabilities, including Old DuPont's PFAS liabilities.

33. **NEW DUPONT:** Defendant DuPont De Nemours, Inc. ("New DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware. Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and Old DuPont. DowDuPont, Inc. was subsequently divided into three publicly-traded companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. Upon information and belief, New DuPont has contractually assumed certain of Old DuPont's environmental liabilities, including Old DuPont's PFAS liabilities.

34. **OLD DUPONT:** Defendant E.I. DuPont de Nemours and Company ("Old DuPont") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware.



Case ID: 260803949

35. **TYCO:** Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business at 1400 Pennbrook Parkway, Lansdale, PA 19446. Tyco acquired Chemguard in 2011.

36. Upon information and belief, the following **Discharger Defendants** used, handled, stored, discharged, and/or disposed of the Fluorosurfactant Products that have contaminated and continue to contaminate Plaintiffs' Properties.

37. **AUTONEUM:** Defendant Autoneum North America, Inc. ("Autoneum"), is a Delaware corporation with its principal place of business at 29293 Haggerty Road, Novi, Michigan 48377. Upon information and belief, in 2011, Autoneum merged with Rieter Automotive North America, Inc. Autoneum is registered to do business in Pennsylvania.

38. Magee Carpet Company, which manufactured carpets for domestic and commercial use at a mill located at 480 W 5th St, Bloomsburg, PA, 17815 (the "Autoneum Mill"). Upon information and belief, Magee Carpet Company bought PFAS from at least one of the Manufacturer Defendants.

39. Upon information and belief, in 1996, Rieter Automotive Systems entered into a joint venture with Magee Carpet Company, and in 2005 Rieter Automotive Systems acquired full ownership of the Autoneum Mill. In 2011, Rieter Automotive Systems Division was separated from the larger Rieter organization to create Autoneum Holdings Ltd, of which Autoneum North America, Inc. ("Autoneum") is a fully owned subsidiary. Since 2011, Autoneum has been the sole owner and operator of the Autoneum Mill since 2011.5

---

5 *See* Autoneum Annual Report 2011, available at https://www.autoneum.com/wp-content/uploads/2017/09/Annual_Report_2011.pdf (last accessed August 28, 2026); https://www.wheresteamlives.net/the-mill-and-the-loom.

40. On August 18, 2026, the Press Enterprise – a local new source – published an article stating that Autoneum had notified the State that groundwater on part of its property tested positive for PFAS.

41. Upon information and belief, Autoneum has discharged PFAS-containing industrial waste into the Bloomsburg municipal wastewater system since at least 1989.

42. Upon information and belief, current and former Autoneum Mill owner/operators used Manufacturer Defendants' Fluorosurfactant Products and improperly disposed of PFAS-containing waste.

43. **MILCO:** Defendant Milco Industries, Inc. ("Milco") is a Pennsylvania corporation with its principal place of business located at 550 E 5th St, Bloomsburg, PA 17815. Milco is a vertical fabric manufacturer with the ability to knit, dye, and finish a variety of fabrics.

44. Milco is a textile manufacturer located in Bloomsburg, Pennsylvania. Milco discharged wastewater to the City's wastewater system beginning in the 1960s or the 1970s. Upon information and belief, Milco used and disposed of PFAS and/or PFAS-containing products at their Bloomsburg facility.

45. **KAWNEER:** Defendant Kawneer Company, Inc. ("Kawneer") is a Delaware corporation with its principal place of business located at 201 Isabella Street, Pittsburgh, PA 15212. Kawneer is a manufacturer of architectural aluminum systems and products for the commercial construction industry. Kawneer has a manufacturing facility located in Bloomsburg, Pennsylvania.

46. Kawneer's Bloomsburg facility has been connected to the City's wastewater system since 1987 at the latest. Kawneer's manufacturing process involves aluminum anodizing and conversion coating—a common source of PFAS in wastewater. Upon information and belief, Kawneer has used and disposed of PFAS and/or PFAS-containing products at their Bloomsburg facility.

47. Upon information and belief, Defendant John Does 1-49 were manufacturers and/or sellers of AFFF or PFAS-containing products used by a Discharger Defendant. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time the Plaintiff will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

48. All of the foregoing Defendants, upon information and belief, have previously conducted and/or currently conduct their business throughout the United States. Moreover, some of the foregoing Defendants, if not all, have conducted and/or are currently conducting business in the Commonwealth of Pennsylvania.

49. Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

50. The term "Defendants," without naming any specific one, refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

## III. JURISDICTION & VENUE

51. This Court has jurisdiction pursuant to 42 Pa.C.S.A. § 931.

52. Venue is appropriate in this county because it is the judicial district in which Plaintiffs are residents and citizens, a substantial part of the property that is the subject of this action is situated in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL PLAINTIFFS AND CLASS MEMBERS

### A. THE CONTAMINANTS

53. PFOA and PFOS are toxic, persistent, man-made chemicals within a class known as perfluoroalkyl acid ("PFAA"). PFAAs are part of the larger chemical family known as PFAS. PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature, which is a reason why these molecules are so persistent. PFOA contains eight carbon-fluorine bonds, which is why it is sometimes referred to as "C8."

54. PFAAs are sometimes described as long-chain and short-chain, depending on the number of carbon atoms contained in the carbon chain. PFOA is considered a long-chain PFAAs because it contains eight carbon atoms in their chains; short-chain PFAAs have six or less carbon atoms in their chains.

55. PFOA and PFOS are highly water soluble, which increases the rate at which they spread throughout the environment, contaminating soil, groundwater, and surface water. Their mobility is made more dangerous by their persistence in the environment and resistance to biologic, environmental, or photochemical degradation.6

56. PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver. They have been found globally in water, soil, air, as well as in human food supplies, breast milk, umbilical cord blood, and human serum.7

---

6 EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R-16-005 (May 2016) at 16; and Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 16.
7 EPA Document Number: 822-R-16-005 (May 2016) at 18-20, 25-27; and EPA Document Number: 822-R-16-004 (May 2016) at 19-21, 26 28.


Case ID: 260803949

57. PFOA and PFOS are persistent in the human body. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.8

58. Since they were first produced, information has emerged showing negative health effects caused by exposure to PFOA and PFOS.

59. According to the United States Environmental Protection Agency ("EPA"), "current peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to:

- Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.
- Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.
- Increased risk of some cancers, including prostate, kidney, and testicular cancers.
- Reduced ability of the body's immune system to fight infections, including reduced vaccine response.
- Interference with the body's natural hormones.
- Increased cholesterol levels and/or risk of obesity."9

60. EPA has also warned that "there is suggestive evidence of carcinogenic potential for PFOS." 10

8 EPA Doc. Number: 822-R-16-005 (May 2016) at 55; and EPA Doc. Number: 822-R-16-004 (May 2016) at 55.

9 "Our Current Understanding of the Human Health and Environmental Risks of PFAS," US EPA, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last accessed August 28, 2026).

10 "Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)" U.S. Environmental Protection Agency Office of Water Health and Ecological Criteria Division, EPA Document Number: 822-R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed August 28, 2026).



Case ID: 260803949

61. In 2016, EPA issued Health Advisory Levels of 70 parts per trillion ("ppt") for PFOA and PFOS found in drinking water. When both PFOA and PFOS are found in drinking water, the combined concentrations should not exceed 70 ppt.

62. In June 2022, after evaluating over 400 studies published since 2016 and applying human health risk assessment approaches, tools, and models, EPA concluded that the new data indicates that the levels of PFOA and/or PFOS exposure at which negative outcomes could occur are much lower than previously understood when the agency issued its 2016 HAs for PFOA and PFOS of 70 ppt. On June 15, 2022, EPA issued interim, updated drinking water health advisories of 0.004 ppt for PFOA and 0.02 ppt for PFOS that replace those EPA issued in 2016.[11]

63. On March 14, 2023, EPA announced proposed National Primary Drinking Water Regulations to establish legally enforceable levels, called Maximum Contaminant Levels ("MCLs"), for six PFAS known to occur in drinking water: PFOA, PFOS, perfluorononanoic acid ("PFNA"), hexafluoropropylene oxide dimer acid (commonly known as "GenX"), perfluorohexane sulfonic acid ("PFHxS"), and perfluorobutane sulfonic acid ("PFBS").[12]

64. EPA proposed individual MCLs of 4.0 ppt for PFOA and PFOS, and is proposing to regulate PFNA, HFPO-DA, PFHxS, and PFBS as a mixture, through an approach called a Hazard Index.[13]

65. In its final rule EPA set limits for five individual PFAS: PFOA, PFOS, PFNA, PFHxS, and HFPO-DA (known as GenX Chemicals). And EPA set a hazard index level for two or more of

---

11 See "Historical PFOA and PFOS Health Effects Science Documents," US EPA, available at https://www.epa.gov/sdwa/historical-pfoa-and-pfos-health-effects-science-documents (last accessed August 28, 2026).

12 EPA, "Fact Sheet: EPA's Proposal to Limit PFAS in Drinking Water March 2023," available at https://www.epa.gov/system/files/documents/2023-04/Fact%20Sheet_PFAS_NPWDR_Final_4.4.23.pdf (last accessed 8/28/2026).

13 *Id*.

four PFAS as a mixture: PFNA, PFHxS, HFPO-DA, and PFB. The EPA set the Maximum Contaminant Level Goal for PFOA and PFOS at zero.14

66. On April 19, 2024 the EPA announced that it was taking another step in its effort to protect people from "the health risks posed by exposure to "forever chemicals" in communities across the country" by designating PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA).15

**B. MANUFACTURER DEFENDANTS' FLUOROSURFACTANT PRODUCTS**

67. PFOA, PFOS, and their chemical precursors are used to make a variety of consumer and industrial goods sold, supplied, used, and disposed of in the Commonwealth of Pennsylvania, including but not limited to nonstick cookware, waterproofing waxes, stain-preventing coatings, and AFFF.

68. The Fluorosurfactant Products designed, manufactured, marketed, distributed, and/or sold by Defendants contained PFOA, PFOS, and/or their chemical precursors.

69. When used as the Manufacturer Defendants intended and directed, Manufacturer Defendants' Fluorosurfactant Products release PFAS, including PFOA, PFOS, and/or their chemical precursors, into the environment.

70. Once PFOA and PFOS are free in the environment, these chemicals do not hydrolyze, photolyze, or biodegrade under typical environmental conditions, and are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, sediment, surface water and groundwater.

---

14 "PFAS National Primary Drinking Water Regulation Fact Sheet" available at https://www.epa.gov/system/files/documents/2024-04/pfas-npdwr_fact-sheet_general_4.9.24v1.pdf

15 "Biden-Harris Administration Finalizes Critical Rule to Clean up PFAS Contamination to Protect Public Health," https://www.epa.gov/newsreleases/biden-harris-administration-finalizes-critical-rule-clean-pfas-contamination-protect.



Case ID: 260803949

71. The use of Manufacturer Defendants' Fluorosurfactant Products as directed and intended by the Manufacturer Defendants allowed PFOA, PFOS, and/or their chemical precursors to enter the environment where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the soil, sediment, groundwater, and surface water, including Plaintiffs' Properties, thereby causing extensive and ongoing damage to Plaintiffs and Plaintiffs' Properties.

72. Due to the chemicals' persistent nature, among other things, these chemicals have and continue to cause injury and damage to Plaintiffs and Plaintiffs' Properties.

### C. DEFENDANTS' KNOWLEDGE AND CONCEALMENT OF PFAS HAZARDS

73. On information and belief, by the 1970s, Manufacturer Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and (b) when sprayed or otherwise released in the open environment, per the instructions given by the manufacturer, PFOA and PFOS readily migrate through the subsurface, mix easily with surface water and groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from drinking water supplies only at substantial expense.

74. At all times pertinent herein, Manufacturer Defendants also knew or should have known that PFOA and PFOS present a risk to human health and could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.


Case ID: 260803949

75. In 1980, 3M published data in peer-reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.16

76. By the early 1980's, the industry suspected a correlation between PFOS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.

77. In 1981, Old DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. Old DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects – one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.17

78. Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memorandum, 3M's medical officer warned "we must view this present trend with serious concern. It is certainly possible that … exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."18

79. Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS. Some of 3M's PFOS-based productions, such as its AFFF production, did not fully phase out until 2002.

80. From 1951, Old DuPont, and on information and belief, Chemours, designed, manufactured, marketed and sold Fluorosurfactant Products, including Teflon nonstick cookware, and

16 Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades, (last accessed 28, 2026).
17 Memorandum "C-8 Blood Sampling Results, Births and Pregnancies," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades, (last accessed 28, 2026).
18 Memorandum "Organic Fluorine Levels," August 31, 1984, available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades, (last accessed 28, 2026).

more recently PFAS feedstocks such as Forafac 1157 and Forafac 1157N, for use in the manufacturing of various Fluorosurfactant Products.

81. On information and belief, in 2001 or earlier, Old DuPont manufactured, produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks to some or all of the Defendants for use in their Fluorosurfactant Products that were discharged into the environment and contaminated Plaintiffs' Properties.

82. Old DuPont had been studying the potential toxicity of PFOA since at least the 1960's and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.19

83. By December 2005, the EPA uncovered evidence that Old DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History."20 The EPA fined Old DuPont for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."21

84. By July 2011, Old DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over Old DuPont's releases from the Washington Works plant had reviewed the available scientific evidence and notified Old DuPont of a "probable link" between PFOA exposure

19 *Id*., Fred Biddle, "DuPont confronted over chemical's safety," Wilmington News Journal (Apr. 13, 2003). The Wilmington News Journal is published in Wilmington, Ohio.
20 $16.5 million.
21 U.S. Environmental Protection Agency, Reference News Release, "EPA Settles PFOA Case Against DuPont for Largest Environmental Administrative Penalty in Agency History" (Dec. 14, 2005), https://www.epa.gov/enforcement/reference-news-release-epa-settles-pfoa-case-against-dupont-largest-environmental (last viewed August 28, 2026).



Case ID: 260803949

and the serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[22, 23] By October 2012, the C8 Science Panel had notified Old DuPont of a probable link between PFOA and five other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative colitis.

85. In July 2015, Old DuPont spun off its chemicals division by creating Chemours as a new publicly-traded company, once wholly-owned by Old DuPont. By mid-2015, Old DuPont had dumped its perfluorinated chemical liabilities into the lap of the new Chemours.

86. Notwithstanding this knowledge, Defendants negligently and carelessly: (a) designed, manufactured, marketed, distributed, sold, and/or assumed or acquired liabilities for the manufacture and/or sale of Fluorosurfactant Products; (b) issued instructions on how Fluorosurfactant Products should be used and disposed of (namely, by washing the foam into the soil or wastewater system), thus improperly permitting PFOA, PFOS, and/or their precursor chemicals to contaminate Plaintiffs' Properties; (c) failed to recall and/or warn the users of Fluorosurfactant Products, negligently-designed products containing or degrading into PFOA and PFOS, of the dangers of surface water, soil, sediment, and groundwater contamination as a result of standard use and disposal of these Products; and (d) further failed and refused to issue the appropriate warnings and/or recalls to the users of Fluorosurfactant Products, notwithstanding the fact that Defendants knew or could reasonably ascertain the identities of the purchasers of their Fluorosurfactant Products.

---

22 Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease.

23 The C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011), http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf (last viewed August 28, 2026).

87. Defendants had a duty and breached their duty to evaluate and test such Fluorosurfactant Products adequately and thoroughly to determine their potential human health and environmental impacts before they sold such products. Defendants also had a duty and breached their duty to minimize the environmental harms caused by Fluorosurfactant Products. Moreover, Defendants failed to warn Plaintiffs of the known risks for environmental and health hazards arising from the usage of Defendants' Fluorosurfactant Products in their intended manner for their intended purpose.

88. Defendants knowingly concealed material facts, including but not limited to the following: the toxicity of Fluorosurfactant Products, that Fluorosurfactant Products persist for long periods of time in the environment, and that the use of Fluorosurfactant Products could lead to contamination of nearby groundwater wells. Defendants concealed these facts while actively promoting the use of their products for uses that would cause water contamination; for example, Defendants' encouraged use of their product when training. Defendants concealed these facts to allow for continued sale and use of its products. Defendants intended for their actions to encourage users of their products to use Fluorosurfactant Products in ways that led directly to PFAS entering the environment, including surface water and groundwater. The users of Defendants' products – including those who used PFAS-containing products leading to contamination of Plaintiffs' properties – relied on Defendants various representations. In addition, Plaintiffs have relied of Defendants' various representations – including but not limited to representations regarding the toxicity of PFAS. As a result of these representations, Plaintiffs have been harmed.

89. As a direct and proximate result of Defendants' actions and/or inactions alleged in this Complaint, Plaintiffs' Properties have been contaminated, and will continue to be contaminated, with PFAS, including PFOA and PFOS, creating an environmental hazard, unless such contamination is remediated. As a direct and proximate result of Defendants' actions and/or inactions, Plaintiffs must

assess, evaluate, investigate, monitor, treat, filtrate, remove, clean up, correct, and/or remediate PFAS contamination of their Properties at significant expense, loss and damage to Plaintiffs.

**D. FAILURES OF DISCHARGER DEFENDANTS**

90. Upon information and belief, Discharger Defendants purchased, stored, used, and disposed of PFAS-containing products into the City of Bloomsburg's wastewater system.

91. Discharger Defendants generated industrial waste or wastewater containing PFAS as part of its operations and discharged that waste or wastewater to the municipal sewer system for treatment by the City of Bloomsburg, Pennsylvania ("City").

92. Discharger Defendants knew or should have known that its waste or wastewater contained PFAS and/or PFAS-containing products, but failed to adequately disclose to the City the presence, identity, characteristics and concentrations of those compounds in its discharges. Discharger Defendants also failed to prevent PFAS and/or PFAS-containing products from releasing to the City's wastewater system.

93. Discharger Defendants knew or should have known about the characteristics of PFAS which make it inappropriate for land application.

94. Discharger Defendants knew or should have known that the City disposed of sewage sludge through land application.

95. Discharger Defendants failed to follow warnings provided by Manufacturer Defendants.

96. Discharger Defendants further failed to warn the City that PFAS and/or PFAS-containing products are persistent chemicals that can pass through conventional wastewater-treatment processes, accumulate in sewage sludge and biosolids, and cause environmental contamination if such residuals are land applied.



Case ID: 260803949

97. As a result of Defendant's failure to disclose and warn, PFAS originating from Defendant's wastewater entered the City's wastewater-treatment system, became incorporated into sludge and biosolids generated by the City, and were ultimately released to the environment through the land application of those materials, causing contamination of the Class Members' properties.

**E. OLD DUPONT'S FRAUDULENT PLANS TO SHIELD ITS ASSETS FROM ITS PFAS LIABILITIES**

98. By 2013, Old DuPont faced mounting liabilities arising out of its long-running manufacture, use, marketing, distribution, and sale of PFOA and/or its chemical precursors throughout the country. These liabilities included, among other things, clean-up costs, remediation obligations, tort damages, natural resources damages, and potential punitive damages.

99. Upon information and belief, by 2013, in order to shield its assets from these liabilities and make itself a more appealing merger partner, Old DuPont began to consider and/or engage in a complex series of corporate restructurings and spin-offs.

100. In or around 2014, Old DuPont formed The Chemours Company as a wholly-owned and operated subsidiary. Shortly thereafter, Old DuPont transferred its "Performance Chemicals" business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) to Chemours.

101. At the time of the transfer of its Performance Chemicals business to Chemours, Old DuPont had been sued, threatened with suit, and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liabilities for damages and injuries arising from its manufacture and sale of its PFAS products, including PFOA and its chemical precursors.

102. Upon information and belief, prior to the spinoff, Chemours was a wholly-owned subsidiary of Old DuPont and its four-member Board of Directors consisted of three Old DuPont employees and a former member of Old DuPont's Board of Directors. Then, effective immediately

prior to the spinoff, the Chemours Board of Directors doubled in size, the three Old DuPont employees resigned, and seven new members were appointed to fill the vacancies. This new Chemours Board of Directors did not take part in negotiating the Separation Agreement.

103. In or around July 1, 2015, Old DuPont completed the spin-off Chemours as a separate public entity and saddled Chemours with Old DuPont's massive PFAS liabilities.

104. Although many of the details of the Separation Agreement remain largely hidden from the public, upon information and belief, as part of the Separation Agreement, Chemours accepted broad assumption of Old DuPont's environmental liabilities arising out of its long-running manufacture, use, discharge, marketing, distribution, and sale of PFAS.

105. Additionally, Chemours agreed to assume for itself and indemnify Old DuPont against all liabilities relating to or arising from the operation of the Performance Chemicals business at any time and regardless of which entity is named in any action or against whom such liabilities are asserted or determined.

106. Further, Chemours agreed to assume for itself and indemnify Old DuPont from all environmental liabilities that arose prior to the spinoff if Old DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals business.

107. Upon information and belief, the value of the assets Chemours transferred to Old DuPont was substantially more than the value of the assets it received from Old DuPont, and Chemours assumed billions of dollars of Old DuPont's PFAS and other liabilities.

108. Old DuPont knew that Chemours was undercapitalized and unable to satisfy the massive liabilities that it assumed from Old DuPont. In addition to the assumption of such liabilities, Chemours was required to provide broad indemnification to Old DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

109. In or around December 2015, Old DuPont entered into an agreement with Dow, Inc. ("Old Dow") pursuant to which Old DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created solely for the purpose of effectuating the merger. Old DuPont and Old Dow became subsidiaries of DowDuPont.

110. Following its creation, DowDuPont engaged in a number of realignments and divestitures, the details of which remain largely hidden from Plaintiffs and other creditors, intended to frustrate and/or hinder creditors with claims against Old DuPont. Upon information and belief, the net effect of these transactions was the transfer, directly or indirectly, of a substantial portion of Old DuPont's assets to DowDuPont for far less than these assets were worth.

111. By 2019, DowDuPont spun-off two new publicly traded companies, Corteva, Inc. and Dow, Inc. ("New Dow"). DowDuPont was then renamed DuPont de Nemours, Inc. ("New DuPont").

112. Upon information and belief, Corteva currently holds Old DuPont as a subsidiary.

113. Upon information and belief, as part of the DowDuPont Separation Agreement, Corteva and New DuPont also assumed direct financial liability of Old DuPont that was not related to the Agriculture, Material Science, or Specialty Products Businesses, including the PFAS liabilities which are allocated on a pro rata basis between Corteva and New DuPont.

## F. THE IMPACTS OF PFAS ON PLAINTIFFS AND CLASS MEMBERS

114. As discussed above, Plaintiffs own real properties affected by PFAS contamination.

115. Plaintiffs who have lived at properties with contaminated drinking water wells have been regularly exposed to PFAS.

116. Through Defendants' acts and omissions PFAS have contaminated Plaintiffs' wells and properties. In addition, Plaintiffs who have lived at properties with contaminated drinking water wells are now at a significantly increased risk of adverse health effects linked to PFAS exposure.

117. The detection and/or presence of PFAS, and the threat of further detection and/or presence of PFAS, on Plaintiffs' Properties has resulted, and will continue to result, in significant injury and damage to Plaintiffs.

118. The invasion of Plaintiffs' Properties with PFAS is continuous and recurring, as new contamination flows regularly and constantly into Plaintiffs' Properties each day—the result of which is a new harm to each Plaintiff and its property in each and every occurrence.

119. The injuries to Plaintiffs caused by Defendants' conduct constitute an unreasonable interference with, and damage to, Plaintiffs' property, including but not limited to the soil and limited subterranean and surficial supplies of fresh drinking water on which Plaintiffs' wells depend.

120. A stigma attaches to Plaintiffs' properties due to PFAS contamination in the area surrounding Plaintiffs' properties, causing a reduction of value of Plaintiffs' properties.

121. For Plaintiffs living at properties with contaminated drinking water wells, exposure to PFAS has occurred, and continues to occur, on a daily basis.

122. Through this action, Plaintiffs seek to recover damages (including but not limited to compensatory, punitive, and/or consequential damages) arising from the ongoing contamination of Plaintiffs' Properties by Defendants' Fluorosurfactant Products. Such damages moreover include, but are not limited to, the past and future costs of restoring and remediating contamination from their real properties and drinking water wells, but also past and future medical costs, costs of medical monitoring, loss of earnings, and household expenses, among others.

123. As a direct and proximate result of defendants' acts and omissions as alleged in this Complaint:

a. Plaintiffs' Properties are contaminated with PFAS, including PFOA and PFOS;

b. Plaintiffs living at properties with contaminated drinking water wells were exposed to significant levels of hazardous PFAS – well above background

levels – through their ordinary use of contaminated water for drinking, cooking, bathing, and cleaning;

c. As a proximate result of the exposure to PFAS, Plaintiffs living at properties with contaminated drinking water wells are at a significantly increased risk of contracting serious latent diseases including cancers;

d. That risk makes periodic diagnostic medical examinations reasonably necessary; and

e. Monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial.

124. As a further direct and proximate result of the acts and omissions of the Defendants alleged in this Complaint, Plaintiffs have sustained and will sustain other substantial expenses and damages, in an amount within the jurisdictional limits of this Court, for which Defendants are strictly, jointly and severally liable.

125. The injuries to Plaintiffs caused and/or threatened by Defendants' acts and omissions as alleged in this Complaint are indivisible.

## V. CLASS ACTION ALLEGATIONS

126. Plaintiffs and Class Members have all suffered injury in fact as a result of the presence of PFAS in the groundwater located at Plaintiffs' properties as a result of Defendants' unlawful conduct.

127. Plaintiffs bring this lawsuit on behalf of themselves and all other individuals that are similarly situated. Plaintiff Jason Jarinko is a Proposed Class Representative for Subgroup 1 and 3. Plaintiff Tyson Hale is a Proposed Class Representative for Subgroup 1, 2, and 3.

128. There are three proposed class subgroups with Class Definitions as follows:

a. Class Subgroup 1: "All who have a proprietary or leasehold interest in real property in Columbia County, Pennsylvania within the map depicted in paragraph 3, where PFAS is present in groundwater as a result of the land application of PFAS-containing municipal sewage sludge."

b. Class Subgroup 2: "All who have a proprietary or leasehold interest in real property in Columbia County, Pennsylvania where PFAS-containing municipal sewage sludge was land applied, as documented in the permits, annuals reports, municipal land application records, or other records maintained by the Pennsylvania Department of Environmental Protection or the City of Bloomsburg."

c. Class Subgroup 3: "All who have, at any time during 1980 or later, resided at a property in Columbia County, Pennsylvania where PFAS has been detected in a drinking water well as a result of the land application of PFAS-containing municipal sewage sludge."

129. Excluded from the putative class are Defendants and their officers, directors, and employees. Plaintiffs reserve the right to modify or amend the Class Definition before the Court determines whether certification is appropriate.

130. Ascertainability. The members of the Class are readily ascertainable by reference to public property records, land application records, water testing records, and declinational of the groundwater plume, and Plaintiffs' personal and employment records.

131. Numerosity. The members of the Class are so numerous that their individual joinder is impracticable. Upon information and belief, there are over 100 putative Class Members.

132. Existence and predominance of Common Questions of Law and Fact. Common questions of law and fact that exist as to all members of the Class predominate over any questions

affecting only individual class members. All members of the Class have been subject to the same conduct and suffer injuries as a result. Questions of law or fact which are common to the Class, as set forth in this Complaint, predominate over questions affecting individual members because class members are similarly situated victims of Defendants' common course of conduct. Defendants' conduct similarly harmed all Class Members because Defendants designed, manufactured, promoted, sold, and disposed of or recommended disposal of PFAS in a way that led to the contamination of Plaintiffs' properties. In addition, Defendants have no defenses specific to individual Class Members, and Defendants' defenses, if any, apply equally to all Class Members. The common legal and factual questions include, but are not limited to, the following:

a. whether PFAS are unreasonably dangerous;

b. whether PFAS-containing sewage sludge applied to land contaminates nearby properties and private wells;

c. whether Defendants could have reasonably foreseen that PFAS, when used as intended or disposed of as reasonably foreseen, would contaminate nearby properties and private wells;

d. whether Defendants could have reasonably foreseen that municipalities may land apply sewage sludge; whether Defendants could have reasonably foreseen that PFAS, when used as intended or disposed of as reasonably foreseen, would cause injurious exposure to individuals who own, reside, work, and visit those properties and/or consume or use water supplied by private wells on those properties;

e. whether the presence of PFAS on properties and in private wells constitutes trespass or nuisance;

f. whether Defendants owed Plaintiffs and Class Members a duty to ensure that their PFAS, when used and disposed of as intended, did not contaminate properties and private wells;

g. whether Defendants owed Plaintiffs and Class Members a duty to warn about hazards associated with PFAS when used and disposed of as intended or reasonably foreseen;

h. whether Defendants owed Plaintiffs and Class Members a duty to warn about PFAS Products' propensity to expose individuals to PFAS through contamination of properties and private wells;

i. whether AFFF discharged upstream of on the Susquehanna River basin was a contributing factor in the PFAS contamination of the Class Members wells;

j. whether Defendants breached their duties;

k. whether Defendants' actions directly and proximately caused Plaintiffs' and Class Members' injuries and damages; and

l. whether Defendants' conduct supports an award of punitive damages.

133. Typicality. Plaintiffs' claims are typical of the claims of the members of the Class in that Plaintiffs are members of the Class that Plaintiffs seek to represent. Plaintiffs own properties contaminated with PFOA and PFOS and other PFAS compounds from the land application of municipal sewage sludge.

134. Adequacy of Representation. Plaintiffs will fairly and adequately protect the interests of the members of the Class. Plaintiffs have retained counsel experienced in litigating environmental torts, products liability, personal injury, and class actions. Plaintiffs have no adverse or antagonistic interests to those in the Class and will fairly and adequately protect the interests of the Class.

Plaintiffs' attorneys are aware of no interests adverse or antagonistic to those of the Plaintiffs and proposed Class.

135. Superiority. A class action is superior to any other theoretically available method for the fair and efficient adjudication of this controversy. Significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigation of essentially identical issues on a class-wide rather than a repetitive individual basis. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system and the issues raised by this action. The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be entailed by individual litigation of the claims against the Defendants. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. No unusual difficulties are likely to be encountered in the management of this class action, and concentrating the litigation in a single forum is particularly convenient to the parties.

**FIRST CAUSE OF ACTION**

**PUBLIC NUISANCE**

**(against all Defendants)**

136. Each Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

137. Manufacturer Defendants have manufactured, distributed, marketed and promoted their product in a manner that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety and comfort of the general public and Plaintiffs,

causing inconvenience and annoyance.

138. Discharger Defendants have used, handled, stored, discharged, and/or disposed of PFAS products and PFAS-containing wastes in a matter that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety and comfort of the general public and Plaintiffs, causing inconvenience and annoyance.

139. Defendants, by their negligent, reckless and willful acts and omissions set forth above, have, among other things, knowingly unleashed massive, long-lasting, and still spreading, environmental contamination, having concealed the threat from all, thereby causing PFAS contamination of Plaintiffs' and Class Members' Properties.

140. By their conduct, Defendants violated, continue to violate, and/or threaten to violate public rights to a clean and unpolluted natural environment, including soil and reserves of unpolluted groundwater.

141. By their conduct, Defendants have unreasonably interfered with the right to uncontaminated groundwater, soil, and drinking water, common to the general public.

142. Actual and threatened PFAS contamination caused by Defendants' conduct has caused and continues to cause injury to each Plaintiff in the form of testing costs and the potential for serious interference with the use, benefit and/or enjoyment of its property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

143. Defendants' conduct has also injured and continues to injure the property, health, safety and/or comfort of a considerable number of persons.

144. PFAS contamination, both real and immediate, constitutes a current existing as well as prospective public nuisance.

145. Plaintiffs and Class Members, as the owner of real property and a private water supply well, suffered injuries different in kind from the community at large precisely because it relies

upon this private well for all water needs.

146. Plaintiffs' and Class Members' special injuries therefore include: additional testing costs, loss of use of the private water supply well, costs of bottled water, loss of confidence in, and enjoyment of, its Property, mental anguish, anxiety, and significant risk of future disease, among others.

147. Defendants knew or in the exercise of reasonable care should have known that the introduction and use of PFAS-containing products, including but not limited to AFFF, would and has unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of each Plaintiffs' and Class Members' Property.

148. As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, Plaintiffs and Class Members suffered injuries common to the public at large and additional special injuries from actual and/or threatened contamination of the Plaintiffs' wells and other real property.

**SECOND CAUSE OF ACTION**

**PRIVATE NUISANCE**

**(against all Defendants)**

149. Each Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

150. Each Plaintiffs' and Class Members' Property – or location where a Class Member lives or has lived – has been contaminated by PFAS as a direct and proximate result of the intentional, unreasonable, negligent and reckless conduct of Defendants, all as alleged herein.

151. This nuisance that Defendants have inflicted upon each Plaintiff is substantial, unreasonable, and intentional or negligent.

152. PFAS contamination caused by Defendants' conduct has damaged Plaintiffs'

Properties and unreasonably interfered with the use, benefit and enjoyment of Plaintiffs' Properties.

153. As a direct and proximate result of Defendants' acts and omissions, PFAS at all times relevant to this litigation has:

a. posed and continues to pose a threat to each Plaintiff's and Class Member's Property

b. contaminated and/or will contaminate Plaintiffs' and Class Members' Properties

c. required and/or will require testing and monitoring of Plaintiffs' and Class Members' Properties;

d. diminished and will continue to diminish the Plaintiffs' and Class Members' confidence in, and the use and enjoyment of, their Properties;

e. diminished and will continue to diminish Plaintiffs' and Class Members' Properties value due to actual, impending, or threatened contamination; and

f. caused and/or will cause each Plaintiff and Class Member to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiffs' and Class Members' damage in an amount within the jurisdiction of this court.

154. As a direct and proximate result of Defendants' acts and omissions creating the above-described nuisance, each Plaintiff has suffered injuries from contamination of Plaintiffs' and Class Members Properties. Defendants had actual knowledge of PFAS' propensity to contaminate groundwater and that PFAS did, in fact, contaminate groundwater where PFAS-containing products were used. Defendants intentionally promoted sales of PFAS, including PFAS-containing products included but not limited to AFFF, in conscious and/or reckless disregard of the known risks of injury to health and property. Discharger Defendants intentionally discharged PFAS into the City's

wastewater system without regard for those who may be affected by such discharge. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for Plaintiffs' and Class Members' water rights.

## THIRD CAUSE OF ACTION

## STRICT LIABILITY- DESIGN DEFECT AND/OR DEFECTIVE PRODUCT

**(against Manufacturer Defendants)**

155. Each Plaintiff and Class Member realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

156. Manufacturer Defendants during the relevant time period were designers, manufacturers, refiners, formulators, sellers, marketers, and suppliers of PFAS-containing products.

157. As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and marketers of PFAS-containing products, including AFFF containing PFAS, Manufacturer Defendants owed a duty to all persons whom Defendants' PFAS containing products might foreseeably harm, including Plaintiff, not to market any product which is unreasonably dangerous for its intended and foreseeable uses.

158. When Manufacturer Defendants placed PFAS-containing products into the stream of commerce, they were defective, unreasonably dangerous, and not reasonably suited for intended, foreseeable and ordinary transportation, storage, handling, and uses for the following reasons:

a. When used as intended, AFFF is sprayed directly into the environment;

b. When AFFF containing PFAS is released into the environment, PFAS have a tendency to mix with groundwater and migrate great distances;

c. Defendants knew PFAS-containing products would be disposed of in the

environment and cause contamination;

d. PFAS are highly soluble in water;

e. PFOS and PFOA are known carcinogens and are unhealthy to ingest.

159. Defendants, with knowledge of the risks, failed to use reasonable care in the design of AFFF containing PFAS and other products containing PFAS.

160. The PFAS-containing products at issue pose greater dangers to groundwater than would be expected by ordinary persons such as the Plaintiff, downstream handlers, users, and the general public exercising reasonable care.

161. The risks which PFAS-containing products pose to groundwater outweigh their utility.

162. Safer alternatives to PFAS exist and have been available to Defendants at alltimes relevant to this litigation.

163. The above-described defects exceeded the knowledge of the ordinary person, and by the exercise of reasonable care Plaintiff would not be able to avoid the harm caused by PFAS-containing products.

164. PFAS-containing products were distributed and sold in the manner intended or reasonably foreseen by the Defendants, or as should have been reasonably foreseen by Defendants.

165. PFAS-containing products reached the consumer and the environment in a condition substantially unchanged from that in which it left Defendants' control.

166. PFAS-containing products failed to perform as safely as an ordinary consumer would expect when used in its intended and reasonably foreseeable manner

167. As a direct and proximate result of the unreasonably dangerous and/or defective condition of PFAS-containing products and their introduction into the stream of commerce by Defendants, PFAS at all times relevant to this litigation have:

a. posed and continues to pose a threat to groundwater and to Plaintiffs' and Class Members' drinking water wells;

b. required and/or will require additional testing and monitoring of Plaintiffs' and Class Members' drinking water wells for PFAS contamination;

c. contaminated and/or will contaminate Plaintiffs' and Class Members' drinking water wells or groundwater in the vicinity of Plaintiffs' and Class Members' Properties;

d. will require remediation of PFAS groundwater contamination or, where remediation is impracticable or insufficient, installation of a system to filter out PFAS or procurement of water from alternative sources; and

e. caused and/or will cause Plaintiffs and Class Members to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiffs' and Class Members' damages in an amount within the jurisdiction of this Court.

168. Defendants had actual knowledge of PFAS' propensity to contaminate groundwater and that PFAS did, in fact, contaminate groundwater where PFAS-containing products were used. Defendants intentionally promoted sales of PFAS-containing products in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for Plaintiffs' and Class Members' water rights.

**FOURTH CAUSE OF ACTION**

**STRICT LIABILITY- FAILURE TO WARN**

**(against Manufacturer Defendants)**

169. Each Plaintiff and Class Member realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

170. As manufacturers, distributors, suppliers, sellers and marketers of products containing PFAS, Manufacturer Defendants had a duty to issue warnings to Discharger Defendants, the

City, Plaintiffs, Class Members, the public, public officials, downstream handlers, and users of the risk posed by PFAS.

171. Defendants knew that PFAS-containing products would be purchased, transported, stored, handled, and used without notice of the hazards which PFAS poses to groundwater and wells.

172. At all times relevant to this litigation, Defendants have had actual and/or constructive knowledge of the following facts which rendered PFAS-containing products hazardous to groundwater and production wells:

a. when used as intended, AFFF is sprayed directly into the environment;

b. when AFFF containing PFAS is released into the environment, PFAS has a tendency to mix with groundwater and migrate great distances;

c. other PFAS-containing products sold to Discharger Defendants would enter the environment through foreseeable disposal and use practices;

d. PFAS is highly soluble in water;

e. PFAS is a known carcinogen and is unhealthy to ingest.

f. the foregoing facts relating to the hazards which PFAS poses to groundwater are not the sort of facts which Plaintiff and the general public could ordinarily discover or protect themselves against in the absence of sufficient warnings.

173. Defendants breached their duty to warn by unreasonably failing to provide warnings concerning any of the facts alleged herein to Discharger Defendants, the City, Plaintiffs, Class Members, public officials, downstream handlers, users, and/or the general public.

174. Defendants' failure to warn as alleged herein proximately caused reasonably foreseeable injuries to Plaintiffs and Class Members. Plaintiffs, Class Members, Discharger Defendants, the City, and others would have heeded legally adequate warnings and PFAS-containing products would have been treated differently in terms of procedures for use, handling, storage, emergency response and/or environmental clean-up.

175. As a direct and proximate result of Defendants' above-described failure to give

warnings, PFAS has at all times relevant to this litigation:

a. posed and continues to pose a threat to groundwater and Plaintiffs' and Class Members' drinking water wells;

b. required and/or will require additional testing and monitoring of the groundwater and Plaintiffs' and Class Members' drinking water wells for PFAS;

c. contaminated, continues to contaminate, and/or will contaminate production wells or groundwater in the vicinity of Plaintiffs' and Class Members' drinking water wells;

d. required the need for remediation of PFAS groundwater contamination or, where remediation is impracticable, installation of a system to filter out PFAS or procurement of water from alternative sources; and

e. caused and/or will cause Plaintiffs and Class Members to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiffs' and Class Members' damage in an amount within the jurisdiction of this Court.

176. Defendants had actual knowledge of PFAS' propensity to contaminate groundwater and that PFAS did, in fact, contaminate groundwater where PFAS-containing products were used. Defendants intentionally promoted sales of PFAS and PFAS-containing products in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for Plaintiffs' and Class Members' water rights.

## FIFTH CAUSE OF ACTION

## TRESPASS

## (against all Defendants)

177. Plaintiffs and Class Members reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated herein.

178. Each Plaintiff is the owner and/or actual possessor of property, easements, wells, right to appropriate and use groundwater, and water rights. Defendants, their agents and employees, knew, or in the exercise of reasonable care should have known, that PFAS is extremely hazardous to property including Plaintiffs' and Class Members' Properties.

179. Defendants intentionally, recklessly, and negligently caused PFAS to enter into the groundwaters, aquifers, soil, and Plaintiffs' Properties.

180. As a direct and proximate result of Defendants' trespass, PFAS at all times relevant to this litigation has:

a. contaminated and/or will contaminate Plaintiffs' and Class Members' Properties;

b. required and/or will require testing and monitoring of Plaintiffs' and Class Members' Properties;

c. requires or will require remediation of PFAS from groundwater, soil, and other media at Plaintiffs' and Class Members' Properties, installation of a system to filter out PFAS, or procurement of water from alternative sources;

d. diminished and will continue to diminish the use and enjoyment of Plaintiffs' and Class Members' Properties;

e. diminished and will continue to diminish the value of Plaintiffs' and Class Members' Properties due to actual, impending, or threatened contamination; and

f. caused and/or will cause Plaintiffs and Class Members to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiffs' and Class Members' damage in an amount within the jurisdiction of this court.

181. As a direct and proximate result of the trespass, Plaintiffs and Class Members have been damaged and are entitled to injunctive relief to abate the trespass and other damages alleged herein, including but not limited to, diminution in property value, loss of use and enjoyment, cost of bringing the property to its original condition, investigation, remediation, and treatment, and/or to

such other appropriate relief Plaintiff may elect at trial.

182. Defendants had actual knowledge of PFAS' propensity to contaminate groundwater and that PFAS did, in fact, contaminate groundwater where PFAS-containing products were used.

183. Defendants had actual knowledge that land application of municipal sewage sludge was a method for disposing of sewage sludge, and that PFAS could be present in such sewage sludge if not properly considered during disposal.

184. Manufacturer Defendants intentionally promoted the sale of PFAS and products containing PFAS in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' and Class Members' Properties, property rights.

**SIXTH CAUSE OF ACTION**

**CIVIL CONSPIRACY**

**(against Manufacturer Defendants)**

185. Each Plaintiff and Class Member realleges and reaffirms all allegations set forth in the preceding paragraphs

186. At all times relevant to this lawsuit, Defendants actually knew of the hazards that PFOA and PFOS posed to the environment, including private water wells like those owned by Plaintiffs.

187. Beginning in the 1960s and continuing through the date of the filing of this Complaint, Defendants agreed to engage in unlawful and wrongful acts that caused damage to Plaintiffs and Class members. Each Defendant performed at least one overt act in furtherance of this

conspiracy. Specifically, Defendants colluded for the avowed purpose of providing information about PFAS-containing products containing PFOA and/or PFOS to the public and the government, with the true, unlawful purpose of:

a. intentionally misrepresenting to the EPA and the public that PFAS-containing products containing PFOA and/or PFOS was safe and did not pose a risk to human health and the environment;

b. concealing the dangers of PFAS-containing products, including the products' characteristics and their propensity to contaminate soil and groundwater, from the government and public by, among other means, repeatedly misrepresenting how products containing PFOA and/or PFOS were being disposed of;

c. concealing the dangers of PFOA and/or PFOS from consumers and the public; and

d. using their considerable resources to fight legislation concerning PFOA and PFOS.

188. As a direct and proximate result of Defendants' conspiracy, Defendants' PFAS-containing products at all times relevant to this litigation have:

a. posed and continue to pose a threat to Plaintiffs' Properties;

b. contaminated and will continue to contaminate Plaintiffs' Properties;

c. contaminated and will continue to contaminate the soil, surface and groundwater on and within the vicinity of Plaintiffs' Properties;

d. required and will continue to require testing and monitoring of Plaintiffs' Properties for PFOA and PFOS contamination;

e. required or will require remediation of PFOA and PFOS contamination or, where remediation is impracticable or insufficient for Plaintiffs and Class Members, removal and disposal of the contamination;

f. diminished Plaintiffs' confidence in, and the use and enjoyment of, Plaintiffs' Properties;

g. diminished the values of Plaintiffs' and Class Members' Properties due to actual, impending, and/or threatened PFOA and PFOS contamination; and

h. caused and/or will cause Plaintiffs and Class Members to sustain substantially increased damages and expenses resulting from the loss of the safety, use,

benefit and/or enjoyment of property.

## SEVENTH CAUSE OF ACTION

## NEGLIGENCE

## (against all Defendants)

189. Each Plaintiff and Class Member realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

190. As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers, users, and handlers of PFAS-containing products, including AFFF and products sold to Discharger Defendants, Manufacturer Defendants owed a duty to Plaintiffs and Class Members as well as to all persons whom Defendants PFAS-containing products might foreseeably harm to exercise due care in the handling, control, disposal, sale, testing, labeling, use, warning, and instructing for use of PFAS-containing products.

191. Manufacturer Defendants had a duty and the financial and technical means to test their PFAS-containing products, and to warn public officials, downstream handlers, users, and the general public of any hazardous characteristics of PFAS known to them, their agents and employees.

192. Discharger Defendants have a duty of reasonable care in the use, handle, store, discharge, and/or dispose of products and product wastes at their facilities.

193. Discharger Defendants have a duty of reasonable care in informing the City that the Mill was discharging persistent, bioaccumulative, and toxic compounds to the City's wastewater system.

194. Defendants had a duty not to contaminate the environment.

195. At all times relevant to this litigation, Defendants knew or should have known that:

a. When used as intended, AFFF is sprayed directly into the environment;

b. When used or disposed of through foreseeable practices, PFAS-containing

products sold to Discharger Defendants would be released into the environment including into municipal wastewater systems;

c. when PFAS is released into the environment, it has a tendency to mix with groundwater and migrate great distances;

d. PFAS is highly soluble in water;

e. when PFAS is released into the environment, it persists over long periods of time;

f. PFAS is a known carcinogen;

g. PFAS contamination creates a need for regular testing and monitoring of wells and ongoing treatment, remediation, and/or clean up;

h. Municipalities disposed of sewage sludge through land application and would not be aware of PFAS discharged into their systems unless properly notified; and

i. the foregoing facts relating to the hazards which PFAS poses to private well owners are not the sort of facts which the City, Plaintiffs, or Class Members could ordinarily discover or protect themselves against in the absence of sufficient warnings.

196. Defendants have negligently breached their duties of due care to Plaintiffs and Class Members, by, among other things:

a. failing to adequately test, identify and remediate wells that are contaminated with PFAS;

b. marketing, touting, and otherwise promoting the benefits of PFAS- containing products without disclosing the truth about the environment and potential health hazards posed by PFAS;

c. failing to eliminate or minimize the harmful impacts and risks posed by PFAS;

d. failing to curtail or reduce the distribution of PFAS-containing products;

e. negligently releasing PFAS into the environment;

f. negligently discharging PFAS into the City's wastewater system; and

g. failing to warn and instruct downstream handlers, users, and the general public about the risks to groundwater and water supply wells posed by PFAS-containing products.

197. As a direct and proximate result of one or more of the foregoing negligent acts or omissions on the part of Defendants, PFAS at all times relevant to this litigation has:

a. posed and continues to pose a threat to Plaintiffs' and Class Members' Properties;

b. required and/or will require additional testing and monitoring of Plaintiffs' and Class Members' Properties for PFAS contamination;

c. contaminated Plaintiffs' Properties;

d. required and will require remediation of PFAS contamination of Plaintiffs' Properties;

e. diminished value of Plaintiffs' Properties;

f. caused a significant increased exposure, considerably above background levels, to Class Members living at properties where PFAS is present in well water;

g. caused a significant increase risk of disease to Class Members living at properties where PFAS is present in well water; and

h. caused and/or will cause Plaintiffs to sustain substantially increased expenses, loss of the use of water and a threat to its appropriative water rights, all to Plaintiff's damage in an amount within the jurisdiction of this court.

198. Defendants had actual knowledge of PFAS' propensity to contaminate groundwater and the fact that PFAS contaminates groundwater where PFAS-containing products are used. Defendants intentionally promoted the sale of PFAS and products containing PFAS in conscious and/or reckless disregard of the known risks of injury to health and property. Defendants committed each of the above-described acts and omissions knowingly, willfully, and/or with fraud, oppression, or malice, and with conscious and/or deliberate disregard for the health and safety of others, the safety of groundwater and drinking water supplies, and for the Plaintiffs' and Class Members' water rights.

## EIGHTH CAUSE OF ACTION

## UNJUST ENRICHMENT

## (DISCHARGER DEFENDANTS)

199. Each Plaintiff and Class Member realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

200. This Cause of Action pertains to Subclass 1 and 2, but not Subclass 3.

201. Discharger Defendants released PFAS and/or PFAS-containing wastes into the City's wastewater system rather than using another, more expensive disposal method, specifically including but not limited to disposal of PFAS and PFAS-containing waste in a landfill.

202. Plaintiffs and members of Subclasses 1 and 2 are now left with farmland and groundwater containing PFAS chemicals.

203. PFAS entering the subject properties resulted in a benefit conferred on the defendant by the Plaintiffs and Class members (Subclasses 1 and 2).

204. Discharger Defendants appreciated that benefit.

205. Under this circumstance, the benefit received by the Dischargers Defendants is inequitable, and Plaintiffs and members of Subclasses 1 and 2 seek disgorgement and/or other such injunctive and equitable relief as the Court deems just and proper.

**NINTH CAUSE OF ACTION**

**VIOLATION OF PENNSYLVANIA'S UNIFORM VOIDABLE TRANSACTIONS ACT**

**(Against UVTA Defendants)**

206. Each Plaintiff and Class Member realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

207. Plaintiffs and Class Members seek equitable and other relief pursuant to the Pennsylvania Uniform Voidable Transactions Act ("UVTA"), as adopted by the Commonwealth of Pennsylvania in 12 Pa. C.S.A. § 5101 et seq., against Old DuPont, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and New DuPont (collectively, the "UVTA

Defendants").

208. Pursuant to 12 Pa. C.S.A. § 5104(a), "[a] transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

1) with actual intent to hinder, delay or defraud any creditor of the debtor; or

2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

   i. was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

   ii. intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."

209. Further, 12 Pa. C.S.A. § 5104(b) states that, "[i]n determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether [...] before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; the transfer was of substantially all the debtor's assets; [...] the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred."

210. Upon information and belief, in February 2014, Old DuPont formed The Chemours Company as a wholly-owned subsidiary, and used it to spin off Old DuPont's "Performance Chemicals" business line in July 2015.

211. Upon information and belief, at the time of the spinoff, Old DuPont's Performance Chemicals division contained the Fluorosurfactant Products business segments. In addition to the transfer of the Performance Chemicals division, The Chemours Company accepted broad assumption of liabilities for Old DuPont's historical use, manufacture, and discharge of PFAS.

212. Upon information and belief, at the time of the transfer of its Performance Chemicals business to The Chemours Company, Old DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding Old DuPont's liability for damages and injuries from the manufacture and sale of Fluorosurfactant Products.

213. The UVTA Defendants have (a) acted with intent to hinder, delay and defraud parties, such as Plaintiffs and Class Members, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or (i) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

214. The UVTA Defendants engaged in actions in furtherance of a scheme to transfer Old DuPont's assets out of the reach of Plaintiffs and Class Members, and other similar parties, that have been damaged as a result of UVTA Defendants' conduct, omissions, and actions described herein.

215. Upon information and belief, as a result of the transfer of assets and liabilities described in this Complaint, the UVTA Defendants have attempted to limit the availability of' assets to cover judgements for all of the liability for damages and injuries from the manufacturing, marketing, distribution, and/or sale of Fluorosurfactant Products.

216. Pursuant to 12 Pa. C.S.A. § 5101 *et seq.*, each Plaintiff and Class Member seeks to avoid the transfer of Old DuPont's liabilities for the claims brought in this Complaint and to hold the UVTA Defendants jointly and severally liable for any damages or other remedies that may be

awarded by the Court or a jury to each Plaintiff and Class Member under this Complaint.

217. Each Plaintiff and Class Member further reserves such other rights and remedies that may be available to them as may be necessary to fully compensate each Plaintiff and Class Member for the damages and injuries they have suffered as alleged in this Complaint.

**PUNITIVE DAMAGES**

**(against all Defendants)**

218. Each Plaintiff and Class Member realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated herein.

219. Under the applicable laws of the Commonwealth of Pennsylvania, Plaintiffs and Class Members seek punitive damages due to the wanton and willful acts and/or omissions of Defendants as set forth and alleged throughout this Complaint.

**PRAYER FOR RELIEF**

Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

i. Certify the Class and Subclasses as requested;

ii. Appoint Plaintiffs to serve as the Class Representatives;

iii. Appoint Andrew Cvitanovic and Brett Land as Lead Class Counsel;

iv. Compensatory damages according to proof including, but not limited to:

a. costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of PFAS contamination on and within Plaintiffs' Properties;

b. costs and expenses related to the past, present, and future treatment and remediation of PFAS contamination of Plaintiffs' Properties or, in the alternative, the costs and expenses associated with and related to the removal and disposal of the contamination;

c. costs and expenses relating to medical monitoring;

d. costs and expenses related to the past, present, and future installation and maintenance of monitoring mechanisms to assess and evaluate PFAS on



Case ID: 260803949

and within Plaintiffs' Properties; and

e. costs and expenses related to the past, present, and future installation and maintenance of treatment mechanisms to remove PFAS from water supplied to Plaintiffs' Properties.

v. punitive damages;

vi. consequential damages;

vii. costs, disbursements and attorneys' fees of this lawsuit;

viii. pre-judgment and post-judgment interest; and

ix. any other and further relief as the Court deems just, proper, and equitable.

WHEREFORE, Plaintiffs demand of defendants, severally and jointly, on alternative Causes of Action, a sum in excess of Fifty Thousand Dollars ($50,000.00) on each such Cause of Action, exclusive of interest and costs, and a sum in excess of Fifty Thousand Dollars ($50,000.00) in punitive damages.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial.

By: **SHEIN LAW CENTER, LTD.**

*/s/ Benjamin P. Shein*

and

**BARON & BUDD, P.C.**

*/s/ Brett Land*

and

**COSSICH, SUMICH, PARSIOLA & TAYLOR, LLC**

*/s/ Andrew Cvitanovic*

***Attorneys for Plaintiffs***

COMMONWEALTH OF PENNSYLVANIA :

COUNTY OF PHILADELPHIA :

I, Brett Land, being duly sworn according to law, depose and say that I am a lawyer representing Plaintiffs herein and that the facts set forth in the foregoing are true and correct to the best of my knowledge, information and belief. I understand that the statements herein are subject to the penalties of 18 Pa. C.S. Section 4904 relating to unsworn falsification to authorities.

/s/ Brett Land

Date: August 27, 2026